## OLIN GLAZE v. STATE.

No. A-2491.    Opinion Filed May 26, 1917.

(165 Pac. 211.)

1.    LARCENY—Larceny or Live Stock—Statute.  Section 2652, Rev. Laws 1910, defines "larceny" as the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof.   Under this definition, a conviction for the larceny of live stock accomplished by fraud is authorized.

2.    APPEAL AND ERROR—Conviction—Affirmance.  When all the evidence introduced at a trial fairly warrants a conviction and no prejudicial error of law is disclosed, a judgment of conviction will be affirmed.

3.    SAME—Harmless Error—Inaccurate Instructions.  When instructions given by the court are poor in form but free from prejudicial error, the judgment will not be reversed on the ground that they are not precisely accurate.

*Error from District Court, Caddo County;*
*Will Linn, Judge.*

Olin Glaze was convicted of larceny, and he brings error.   Affirmed.

*H. W. Morgan* and *Giddings & Tripp,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J.   Olin Glaze, plaintiff in error, was convicted at the February, 1915, term of the district court of Caddo county, on a charge of larceny, and his punishment fixed at three years in the state penitentiary. The information charges the larceny of two head of cattle, the property of J. C. Childers.   Oklahoma Giles was jointly charged, but separate trials were held.

The proof on behalf of the state discloses the following state of facts:   J. C. Childers lived about three miles east of Carnegie in Caddo county, and was a farmer.   Olin Glaze, plaintiff in error, and Oklahoma Giles lived near by, and were horse traders.   In January, 1915, Giles came to the home of the prosecuting witness and inquired for a bull, and was informed that the witness had a bull, a heifer, and a cow for sale, and was told by Giles that plaintiff in error, Glaze, would buy them.   Witness priced the two yearlings at $70.   Giles told him that he did not think Glaze would pay the money, but had a mare to sell; that he, Giles, wanted the mare, and that if the witness would trade the two yearlings for the mare, he, Giles, would pay $72.50 for the mare, and he said he would go and get Glaze and have him bring the mare over.   Glaze rode the mare over, and asked the witness if he had some yearlings to trade for the mare.   Witness told him he did not.   There was quite a little talk about trading the mare for the yearlings. Witness refused to trade the yearlings for anything, unless he knew he was going to get the money, as he did not want to trade, but wanted to sell.   An effort was made to induce the witness to go in search of Giles with a view of getting the money from him for the mare.   He

would not go, but after considerable persuasion let his son go with Glaze and told both of them that there would be no trade unless he got the money; that if Giles did not have the money, that would be the end of it. About an hour later Giles and Glaze and the boy came back and wanted witness to go to Carnegie to get the money. He got in the buggy with Giles and drove off. Glaze appeared to be on horseback. After going some little distance, a brother-in-law of Giles overtook them with a story, which proved to be untrue, that Giles' wife and baby had been crippled in a runaway. Giles got out of the buggy, got on a horse, and started off. As he rode away, prosecuting witness asked him what he was to do, and Giles told him to meet him in Carnegie the next morning. He was told that witness would meet him there. He then said: "Maybe not tomorrow; I will see you soon"—and went on away. The brother-in-law of Giles got in the buggy and drove the witness home. When they got home, the yearlings were gone. This occurred on Thursday. Neither Giles nor the plaintiff in error said anything further about the matter, nor did either of them bring the money to pay for, the yearlings. On Monday the witness went after the money again, and was told by Giles that he did not have it, that he had expected to get the money from his father, but that the money had been spent. Witness was never paid.

Newton Childers, son of the prosecuting witness, corroborates the testimony of his father. In addition, he says that when he went with Glaze to find Giles, Glaze told him, Giles, that the old man (meaning the prosecuting witness) would not let the cattle go until he got the money; that Giles said, "Let's go and see the old man," which they did, and after the prosecuting witness and

Giles left to go to Carnegie that Glaze and he, without instructions to do so, got the cattle and drove them over to Glaze's place. He rode the mare, and when he got over there started to pull the bridle off and leave her, whereupon Glaze told him that he had better keep her; that she might be all he would ever get for the cattle. Witness did not know what to do, and rode the mare back home because Glaze told him to.

Pearl Childers, daughter of the prosecuting witness, testified to hearing the conversation between Olin Glaze, Oklahoma Giles, and her father concerning the yearlings and their desire to trade the mare for them and that her father declined to consider any trade of any kind, and said the money was what he wanted, and in speaking to plaintiff in error said: "When you get the money, Olin, you get the cattle, and not before."

Witness E. C. Kelley for the state testified to having a transaction with the defendant Glaze and Oklahoma Giles, in which the two parties, working together, fleeced him out of a horse. It was a similar transaction to the one had with Childers.

The evidence clearly indicates that the plaintiff in error, Glaze, and his codefendant, Giles, were working together in a scheme to defraud the farmers of the community out of their property.

Witness Wesley Bees for the state testified to facts corroborating the testimony of Kelley as to the manner in which he was defrauded.

Witness Bogle for the state testified to a similar transaction, wherein he was defrauded by the same parties. Apparently this witness got $5 for a horse worth $125 through the fraudulent conduct of these men.

The testimony in behalf of the defendant given by himself and his witnesses attempted to establish the contention that the mare was traded outright for the yearlings in question, and therefore he had committed no crime.

The jury found against the plaintiff in error, and convicted him of larceny.

A careful reading of the record by any fairminded man would not permit of any other conclusion than that of guilt. This plaintiff in error and Giles, without doubt, had conspired together to defraud the prosecuting witness out of his property. The proof of similar transactions by them which tended to show the manner in which they were conducting their business and the system which they used in defrauding the citizens of the community was competent.

It is contended by counsel for the plaintiff in error that the proof shows no violation of the statutes of this state. With this contention we cannot agree. Section 2652, Rev. Laws 1910, is as follows:

"Larceny is the taking of personal property, accomplished by fraud or stealth, and with intent to deprive another thereof."

This definition is broad enough to cover the charges in this case; in fact, was intended for just such transactions. The proof clearly establishes the crime of larceny by fraud.

There is ample law, as well as ample facts, to support this judgment of conviction.

It is next complained that the court erred in giving instructions Nos. 9 and 10, which are as follows:

"No. 9. You are instructed, gentlemen of the jury, that there has been submitted for your consideration tes-

timony relative to other trades entered into by the defendant in conjunction with others, wherein certain property was alleged to have been obtained by fraud or stealth. This evidence, gentlemen of the jury, is submitted to you for your consideration as the same may or may not tend in determining whether or not the defendant obtained the property described in the information, from the prosecuting witness, J. C. Childers, by fraud or stealth, with the intent to deprive the owner thereof, and for said purpose only.

"No. 10. You are instructed, gentlemen of the jury, if you believe from the evidence in this case beyond a reasonable doubt that the defendant, acting in conjunction with others, by fraud or stealth and with the intent to deprive the owner thereof, obtained possession of property of parties other than the prosecuting witness, J. C. Childers, and that the same constituted a part of a plan of the defendant in obtaining possession of said property, with the intent to deprive the true owner thereof, then you might consider such facts as a circumstance in arriving at the intent of the defendant at the time of obtaining possession of the property for which he is prosecuted, and as to the guilt or innocence of the defendant of the crime charged."

These instructions might be improved upon in form, but there is nothing in them prejudicial to the substantial rights of the plaintiff in error.

Again, counsel complain of the court's action in admitting testimony of the witnesses, Kelley, Bees, and others, in reference to other similar transactions. This testimony was properly admitted. There is no question but that these parties were in a conspiracy to obtain property by fraud. In the case at bar their efforts were successful, as they appear to have been in a number of other instances. The law of this state protects the law-abiding citizens from conduct of this kind.

The judgment is entirely righteous, and the record is without prejudicial error.

Affirmed.

DOYLE, P. J., and MATSON, J., concur.