## JACK MEIGS v. STATE.

No. A-8467.  Feb. 24, 1933.
Rehearing Denied March 18, 1933.
(21 Pac. [2d] 49.)

Vance & Bliss, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J.  Plaintiff in error, hereinafter called defendant, was convicted in the district court of Muskogee

county of the crime of larceny by fraud, and his punishment fixed by the jury at imprisonment in the state penitentiary for a period of four years.

The evidence of the state was that Ross Linder posed as a real estate man and thus became acquainted with C. H. Youngblood, a young mechanic in Muskogee; that Linder represented to Youngblood that he had a rich Indian client who wished to purchase a residence in Muskogee; that, since Linder had no automobile and Youngblood did have one and could thus get about the city, he arranged for Youngblood to find, if possible, such a house on an agreement to split the commission; that Youngblood spent several days seeking to locate such a house; that on November 2, 1931, Linder phoned Youngblood that the Indian was at a certain place and wanted him to come down and meet him; that Youngblood went down and was introduced to one Jack Meigs as the Indian who wanted to purchase the place; that whisky was produced and all the parties took several drinks; that Linder then invited Youngblood to play a little penny ante, borrowing $10 from Meigs to match the $10 of Youngblood's; that at that time Meigs displayed a roll of bills; that, after Linder had lost this $10 and another he borrowed from Meigs, Meigs insisted on being permitted to play his own money, and got into the game in place of Linder; that, after several hands were played, Meigs bet $200 that Youngblood had four eights, and, Youngblood not having much money in front of him, Linder suggested that he write a check for $200 and told Meigs it would be good; that Meigs refused to take a check and insisted that Youngblood go to the bank and get the money; that Meigs proposed that Linder take Meigs' hand and put it in his pocket and that Youngblood put his hand in his pocket and that Linder and Youngblood go to the bank and get the money and

come back and finish the game; that this was done, and shortly afterward Linder and Youngblood returned to the room where the game was going on, with the $200; that the parties had been playing with matches and putting the money paid for the matches in a regular size match-box; that Youngblood's $200 was placed in the box and Youngblood given two slips marked $100 each with which to bet; that thereupon the hands were shown and Meigs had nothing, not even a pair; that it had been agreed that the game would be closed when this hand was played; that Youngblood started to count his matches preparatory to counting the money when Linder went to the door, at a knock, and received a bottle of whisky; that this bottle was passed to Youngblood, who refused to drink at that time; that Meigs and Linder pretended to drink and again passed the bottle to Youngblood, who took a drink; that this whisky contained knock-out drops and Youngblood was rendered unconscious in a very short time; that, when he woke up, the money was gone; that Linder helped him out of the room and told him Meigs had the money and that it would be returned to him as soon as he got sober; that Meigs and Linder were brothers-in-law, professional gamblers, and without any occupation; that Youngblood tried for several days to get his money back, and, failing, went to the county attorney, who brought the prosecution.

Defendant admitted that he was engaged in a poker game with Youngblood, but claimed that he won the money in an ordinary game and that no knock-out drops were used in the whisky.

Defendant contends that there is a fatal variance between the information and the proof; the information charging larceny by fraud, and the proof showing, if anything, larceny by stealth.

A reading of the record discloses that Linder and Meigs were engaged in the business of entrapping unwary victims and taking their money away from them in whatever way might be necessary to get the money. It is apparent that the real estate transaction was but a blind to get Youngblood into the game and take away from him—either with a game of cards or knock-out drops—whatever money he might have with him.

This court has had under consideration the questions of the necessary allegations of an information and the difference between larceny by fraud or stealth and embezzlement. Bivens v. State, 6 Okla. Cr. 521, 120 Pac. 1033, there following and approving Flohr v. Territory, 14 Okla. Cr. 477, 78 Pac. 565; Glaze v. State, 13 Okla. Cr. 431, 165 Pac. 211. It has also been held that the crime may be shown by proof that property was taken feloniously. People v. Jersey, 18 Cal. 338; People v. Smith, 23 Cal. 280; People v. Smallman, 55 Cal. 185.

It is apparent from the evidence and the authorities above cited that there was no variance between the allegations of the information and the proof.

It is next contended that the court erred in admitting certain incompetent evidence. An examination of the record discloses that the evidence complained of by counsel for defendant was admitted in most instances without objection on his part and without any exceptions or motion to take and exclude the same from the jury.

Defendant may not sit silently by and permit the introduction of incompetent testimony without objection, and predicate error thereon.

It appears from the evidence that the scheme used by defendant and Linder was from its inception conceived in iniquity with the sole purpose of cheating and defraud-

ing Youngblood of his money. It may be defendant and Linder did not know just how this fraud would finally terminate. They laid their plans and weaved the net and finally got Youngblood into it, and awaited developments to determine just how they would get his money. Although they did not know the exact amount of money they would get, it was undoubtedly their scheme to get all they could at any one time and continue the conspiracy if they believed it possible to obtain more from him. This plan is similar to fake horse races, foot races, wrestling matches, and other fake gambling games by which the unsuspecting individual is fleeced of his money by first obtaining his confidence by pretending to have some other deal or purpose, and then fleecing their victim.

Men who engage in such practices as this record discloses these men engaged in will not be permitted to escape just junishment because of inconsequential errors or legal technicalities.

The defendant being clearly guilty of the crime of which he was charged and convicted, and no fundamental error appearing in the record, the cause is affirmed.

EDWARDS, P. J., concurs. DAVENPORT, J., not participating.